Filed 7/23/26  Connolly v. Garamendi CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

(Calaveras)

| | |
|---|---|
| KATHERINE GARAMENDI CONNOLLY et al.,<br>    Plaintiffs, Cross-defendants and Appellants,<br><br>        v.<br><br>MARY ANNE GARAMENDI,<br>        Individually and as Trustee, etc.,<br>Defendant, Cross-compliant and Respondent. | C101495<br><br>(Super. Ct. No. 21CV45154) |

This case involves a property dispute between family members regarding the Garamendi McSorley Ranch (the Ranch), located in Calaveras County.  The dispute concerns the interpretation of several easements that plaintiffs granted to defendant so that she could access her otherwise landlocked parcels.  The easements state that they are granted "solely for the purpose for providing ingress and egress" to the benefitted parcels.  The parties dispute whether (1) the easements permit defendant to travel directly between her parcels or only to pass over plaintiffs' property to reach the nearest state highway; (2) the easements permit defendant to use the easements for non-travel related purposes, such as recreational activities, dog walking, and temporary parking; (3) plaintiffs have the right to maintain locked gates across the easements; (4) plaintiffs have the right to install and maintain recording devices to monitor use of the easements; and (5) plaintiffs have the right to install "no trespassing" signs on the easements.

1

After trial, the trial court issued a decision that is mostly in defendant's favor. Plaintiffs appeal, arguing that the trial court erred by admitting extrinsic evidence to aid its interpretation of the easements and by interpreting the easements to permit defendant to use the easements for purposes other than ingress and egress. We conclude that the trial court either properly admitted the extrinsic evidence or that any error was harmless. We also conclude that the trial court correctly interpreted the easements to permit defendant to travel directly between parcels without the obstruction of locked gates. However, in certain other respects, the trial court's interpretation of the easements was overbroad. Thus, we will affirm the judgment in part but reverse and remand other portions.

## FACTUAL AND PROCEDURAL BACKGROUND

The Ranch, which has been in the family since the 1860's, was previously owned by Raymond and Mary Jane McSorley Garamendi as trustees of the Garamendi Family Trust (the Trust). Raymond and Mary Jane[1] had seven children who were the primary beneficiaries of the Trust: Thomas, John, Samuel, Robert, Celeste, Debra, and Mary Anne (defendant).

After the deaths of Raymond and Mary Jane (in 1991 and 2015, respectively), disputes arose among the surviving children (or their heirs) regarding the disposition of the Trust property. In March 2017, the co-trustees filed a petition seeking court instructions on the administration of the Trust. One of the heirs (Celeste) objected and filed a competing petition. The dispute culminated in a court-approved Settlement and Distribution Agreement (the Settlement).

---

[1]     We will refer to individuals by their first names and mean no disrespect.

A.     *The Settlement Agreement*

Under the Settlement, the Ranch property was divided into four parcels, designated C-1, C-2, C-3, and D-1.  As relevant here, defendant received Parcel C-1, which includes the "Main House" and "Slim's cabin," and Parcel D-1, which includes the "JJ McSorley House."  The allocation to defendant also included several lot line adjustments, which had the effect of transferring approximately 11 acres from Parcel C-2 to Parcels C-1 and D-1.  Among other things, the lot line adjustments (1) extended the boundary of Parcel C-1 to the south and west, creating a direct connection from Parcel C-1 to Parcel C-3; (2) added a 10-foot-wide strip along the north edge of Parcel D-1; and (3) extended the northeast boundary of Parcel D-1 so that it abuts Parcel C-3.

Debra received Parcel C-3, which includes the "Lower House."  Her parcel (Parcel C-3) lies between the parcels allocated to defendant (Parcels C-1 and D-1).

Celeste's allotment, Parcel C-2, was distributed directly to her daughters, Katherine and Bridget (collectively, plaintiffs).[2]  There is no residence on Parcel C-2, but the property includes a corral, a barn, and a "blacksmith's shop."  The barn, which has no doors, is used to store materials and equipment, including, at times, an all-terrain vehicle.  The corral abuts the barn.  Across from the barn is the blacksmith's shop, which is owned by four siblings (defendant, Robert, John, and Debra, hereinafter the " 'Family Member Owners' ").  The largest part of Parcel C-2 is open space, which sometimes serves as a "holding field" for cattle.

In addition to the structures, a roadway lies over Parcel C-2, extending from Highway 49 to a point just before the barn, from which it diverges in three directions: straight toward the Main House on Parcel C-1; right toward the JJ McSorley House and

---

[2]     In 2021, Katherine and Bridget conveyed their interests in Parcel C-2 to Garamendi McSorley Ranch, LLC, of which they are the sole members.

Lower House on Parcels C-3 and D-1; and left toward a gate near Slim's cabin on Parcel C-1.

The Settlement agreement contains an integration clause. It provides: "The terms of this Agreement, including all exhibits attached hereto, are intended by the Parties as a final expression of their Agreement with respect to each and every term and condition included herein and may not be contradicted by evidence of any prior agreement, contemporaneous oral agreement, or prior and/or contemporaneous oral representations. The Parties further intend that this Agreement constitutes the complete and exclusive statement of its terms and conditions and that no extrinsic evidence whatsoever may be introduced in any judicial proceeding, if any, involving this Agreement. Any and all agreements or representations regarding the terms and conditions of this Agreement that are not expressly set forth herein are null and void. Any amendments to this Agreement shall be in writing and executed by all Parties to this Agreement."

1. *The Easements*

Because Parcel C-2 lies between Highway 49 and the other three parcels, there would be no access to Parcels C-1, C-3, D-1 from Highway 49 without easements over Parcel C-2. Thus, as part of the Settlement, the parties negotiated non-exclusive easements benefitting Parcels C-1, C-3, and D-1 for ingress and egress over the existing roadway (hereafter, the Easements). The Easements to be conveyed are described in the Settlement, as follows:

"a. <u>Main House Roadway Easement</u>. A deeded 20' non-exclusive easement for ingress and egress on an existing roadway located on Parcel C-2 to Parcel C-1 as shown on **EXHIBIT E-3** as exiting Highway 49 and proceeding east along an existing roadway to boundary of Parcel C-1. This easement, known as the 'Main House Roadway Easement', shall be appurtenant to Parcel C-1 and solely for the purpose for providing ingress and egress to Parcel C-1 for pedestrians, street-legal registered vehicles, construction equipment or persons on horseback. This easement shall allow

4

access to Parcel C-1 only at and through an existing gate at its termination at Parcel C-1 at the base of the hill and shall not allow access to C-1 at any other point along the roadway easement. Nothing in this easement shall prevent the fencing of any part of the boundary between C-1 and C-2.

"b. <u>JJ McSorley (Parcel D-1) and Lower House (Parcel C-3) Roadway Easement</u>. A deeded 20' non-exclusive casement for ingress and egress on an existing roadway located on Parcel C-2 to the residences on Parcels C-3 and D-1 as shown on **EXHIBIT E-3** and **EXHIBIT E-4** as exiting Highway 49 and proceeding along an existing roadway adjacent to the barn on Parcel C-2 to Parcels C-3 and D-1. This easement, known as the 'JJ McSorley (Parcel D-1) and Lower House (Parcel C-3) Easement', shall be appurtenant to Parcels C-3 and D-1 and solely for the purpose for providing ingress and egress to Parcel C-3 and D-1 for pedestrians, street-legal registered vehicles, construction equipment or persons on horseback. The easement shall allow access to Parcel D-1 and Parcel C-3 in the area between Parcel D-1 and C-3. Said easement shall include, as an accessory use, two 'back-up areas' which shall include an approximately 15' square dirt area immediately south/southeast of the Blacksmith Shop building and an approximately 15' square area immediately south/southwest west of the Barn as shown on **EXHIBIT E-3** for backing up and turning around vehicles using the JJ McSorley/D-1 and Lower House/[C]-3 Roadway Easement. These 'back-up areas' may not be used for parking by Parcels C-3 or D-1.

[¶] [¶] [¶] [¶]

"g. <u>North C-1 Vineyard Roadway Easement</u>. A deeded 20-foot roadway easement for ingress and egress on an existing roadway located on Parcel C-2 to Parcel C-1 as shown on **EXHIBIT E-3**. This easement, known as the 'North C-1 Vineyard Roadway Easement,' shall be appurtenant to Parcel C-1 and solely for the purpose for providing ingress and egress to Parcel C-1 for pedestrians, street-legal registered vehicles, construction equipment or persons on horseback. The 'North C-1 Vineyard

Roadway Easement' shall run north from the intersection of the 'Main House Roadway Easement' and 'JJ McSorley (Parcel D-1) and Lower House (Parcel C-3) Roadway Easement' and shall overlay in part the CPUD Water Easement.  It shall allow access to Parcel C-1 only at and through a new gate to be constructed at its termination at Parcel C-1 near the CPUD water line access point.  Nothing in this easement shall prevent the fencing of any part of the boundary between Parcels C-1 and C-2."

Notably, the Settlement did not provide for an easement between Parcels C-1 and D-1 over Parcel C-3.  Thus, without permission from Parcel C-3's owner (Debra), the owner of Parcels C-1 and D-1 (defendant) would not be able to travel between those discontinuous parcels without using the Easements over Parcel C-2.

Pursuant to the Settlement, defendant and Debra drafted easements using the language from the Settlement.  Each deed explicitly conveyed to the easement holder a "perpetual," "non-exclusive," and "appurtenant" easement on the existing roadway located on Parcel C-2 "solely for the purpose of providing ingress and egress to [the benefitted property] for pedestrians, street-legal registered vehicles, construction equipment or persons on horseback."

Trial Exhibit Nos. 441 and 442 show the approximate position of each Easement and how they relate to the existing roadway on Parcel C-2.  Consistent with the existing roadway, the three Easements meet at a spot near the barn on Parcel C-2, which the parties refer to as the " 'intersection.' "  From there, the Main House Roadway Easement goes straight along the path of the roadway to the Main House on Parcel C-1; the JJ McSorley/Lower House Easement veers right to Parcels C-3 and D-1; and the Vineyard Roadway Easement veers left to the gate on Parcel C-1.

2. *The Licenses*

In addition to the Easements and lot line adjustments, the parties to the Settlement also agreed to various licenses, three of which we will discuss here.  First, a "Blacksmith Shop Building Access License" (boldface and underline omitted) granted the Family

6

Member Owners and their families access to the Blacksmith Shop to visit or work on the building at any time. Should the Family Member Owners fail to maintain the Blacksmith Shop Building and create a nuisance or hazard, the building may (after notice and opportunity) be deemed abandoned to the owner of Parcel C-2.

Second, a "[Parcel] C-2 Gravel Turnaround" license, granted any lineal descendant (of Raymond and Mary Jane) who owns one of Parcel C-1, C-3, or D-1, a right to temporarily use the gravel turnaround area in Parcel C-2 for the loading/unloading and turnaround of commercial vehicles and trucks/trailers when there is not sufficient parking on Parcels C-1, C-3, or D-1, or when the vehicles are unable to navigate the driveways to such parcels.

Finally, a "Large Group Temporary Parking" (underline omitted) license granted the lineal descendants a limited right to use the gravel turnaround for temporary large-group private family events.

B.      *Easement Disputes*

Distribution of the Trust occurred on November 22, 2019, and the Easements were recorded the same day. Not long after distribution, disputes arose between plaintiffs (owners of Parcel C-2) and defendant (owner of Parcels C-1 and D-1) regarding the scope or uses of the Easements.

The chief dispute concerned whether the Easements, which were granted "solely for the purpose for providing ingress and egress" to Parcels C-1, C-3, and D-1, included the right to travel *directly* between the parcels. Plaintiffs (and their mother Celeste) took the position that because the Easements were granted solely for "ingress and egress," defendant may use the Easements only for travel to/from Highway 49, and for no other purpose. Defendant may not use the Easements to travel directly between Parcel C-1 and Parcel D-1 or to travel directly between one of those parcels and Parcel C-3. Thus, in plaintiffs' view, if defendant wishes to travel from one parcel to another, she must first

7

travel along the roadway all the way to Highway 49, exit the property, re-enter, and then travel back up the roadway to the other parcel. Plaintiffs argued that using the roadway to travel directly between parcels was overburdening the Easements.

In addition, plaintiffs maintained that defendant (and her tenant)[3] were unreasonably burdening the servient estate by treating the Easements as an extension of their private property and using them for non-travel related purposes. In particular, plaintiffs complained that defendant was improperly using the Easements (1) for recreational activities (such as biking, walking the dogs, or giving property tours); (2) for parking; (3) as a place to "loiter" or linger; and (4) as an open area for dogs to wander and children to play.

Another dispute related to whether defendant had the right to pass along the Easements free of obstructions. Beginning in October 2020, plaintiffs closed and locked two gates situated across the roadway Easements—the main entrance gate to the property and a newly-installed gate near the barn—and demanded that defendant keep the gates closed and locked whenever they were not being used. When defendant failed to comply, plaintiffs claimed this was yet another unfair burden on their property rights.

Defendant's position was that she had the legal right to use the Easements to travel between Parcels C-1, D-1, and C-3 free of the restrictions that plaintiffs sought to impose. Defendant argued that plaintiffs were unreasonably interfering with her use and enjoyment of the Easements by (1) prohibiting her from travelling directly between the parcels; (2) imposing unreasonable restrictions on the use of the Easements by children, pets, etc.; (3) installing and maintaining locked gates across the Easements and demanding that defendant keep the gates closed and locked; (4) posting "no trespassing"

---

[3] Defendant's daughter initially lived in the JJ McSorley House on Parcel D-1. In June 2020, the daughter moved to North Carolina, and defendant leased the house to a tenant, Catherine (Cathy) Bourland. For convenience, unless the context indicates otherwise, we will refer to defendant and her tenant collectively as "defendant."

signs on the Easements; (5) photographing and video recording defendant's use of the Easements; and (6) harassing/intimidating defendant and her guests.

## C. *Procedural History*

Plaintiffs sued defendant in February 2021. The operative complaint alleges claims for nuisance, trespass, breach of contract, breach of the covenant of good faith and fair dealing, and declaratory relief, among other claims. Plaintiffs alleged that defendant breached the Settlement and overburdened the Easements by traveling between parcels, using the Easements for non-travel purposes, and refusing to close and lock the gates. Plaintiffs requested injunctive relief, damages, interest, punitive damages, and attorney's fees.

Defendant responded with an amended cross-complaint seeking a declaration of her rights, including her right to (1) travel between parcels free of the restrictions that plaintiffs sought to impose, (2) use the Easements free of harassment, intimidation, and surveillance by plaintiffs, (3) use the Easements without the obstruction of locked gates and free of any obligation to close and lock the gates, (4) compel plaintiffs to remove the "no trespassing" signs they installed on the property, including at the main entrance gate.[4] Defendant also asserted a nuisance claim, alleging that plaintiffs' conduct was part of a scheme to harass defendant and prevent her from enjoying her property.

Plaintiffs filed a motion for a preliminary injunction, a motion to strike defendant's amended cross-complaint, and a motion for summary adjudication, all of which were denied.

---

[4]    In response to plaintiffs' complaint that defendant was required to pay a share of the costs of fencing that plaintiffs constructed, defendant sought a declaration that she was not required to contribute to the cost of fencing. The trial court ruled that defendant was responsible for a portion of the cost of the fencing, and that portion of the ruling does not appear to be an issue on appeal. Accordingly, our decision omits any discussion of the fencing issue.

9

Trial began on March 20, 2023. The parties stipulated to try their declaratory relief claims first. The parties' identified the following issues for trial: (1) whether the Easements allow travel between Parcels C-1, D-1, and C-3, or only allow travel between Parcel C-1, D-1, or C-3 and Highway 49; (2) whether the Easements allow recreational uses (e.g., walking, biking, jogging, exercise, yoga, dog walking), loitering, unaccompanied children or pets, and parking of vehicles; (3) whether defendant has a right to use the Easements free of plaintiffs' surveillance; (4) whether defendant can be compelled to close and lock the gates or instead has the right to use the Easements without obstruction; and (5) whether plaintiffs may maintain the "no trespassing" signs on their property, including at the main entrance gate.

Celeste testified for plaintiffs, as did the parties themselves. Defendant, James, Robert, Mary Anne's tenant (Cathy Bourland), and Mokelumne Hill Fire Protection District Chief Michael Ray Dell'Orto testified for defendant. The testimony of the witnesses is summarized below.

1.      *Travel Between Parcels*

Regarding travel between parcels, plaintiffs' witnesses testified that defendant repeatedly used the Easements to travel directly between Parcels C-1 and D-1 or C-3, without first proceeding to Highway 49 and turning around. Celeste sought to quantify the number of times that this occurred. Based on her review of security camera footage, Celeste calculated that during the period from October 2020 to October 2022, there were approximately 600 instances when defendant (or her guests) *drove* directly from one parcel to another (and back) and approximately 55 instances when defendant (or guests) *walked* directly from one parcel to another (and back).

Defendant did not dispute this testimony and, in fact, stipulated that she and her guests used the Easements in tandem to travel directly between parcels. Defendant testified that before the distribution she routinely traveled directly between the Main House and JJ McSorley House and believed that she could continue to do so under the

10

Easements. There is no evidence that she communicated this belief to plaintiffs prior to the Settlement.

### 2. *Use of the Easements for Non-travel Purposes*

Plaintiffs' witnesses further testified that they observed (personally or through security camera photographs/videos) multiple instances in which defendant (or her guests) used the Easements for purposes other than ingress or egress. The "unauthorized" uses included recreational activities (e.g., dog walking, group tours), loitering/lingering, parking, and permitting unaccompanied children and dogs to wander or play on the Easements. Celeste testified that she observed unaccompanied dogs on the Easements on at least 82 occasions between 2019 and 2022. She observed people "milling about" on the Easements on about ten occasions, and she observed defendant using the Easements to give " 'tours' " of the property on four occasions.

Defendant did not dispute that the Easements were sometimes used by children and dogs, but she did not believe the Easements prohibited children or dogs. Defendant testified that the purpose of the Easements was to allow her and her guests "to come and go" from the parcels. She believed that plaintiffs were imposing restrictions on the use of the Easements as a form of harassment.

### 3. *The Gates*

Plaintiffs' witnesses testified that the main entrance gate, which predated distribution of the Trust, historically had been kept closed and "at times" locked. The witnesses claimed that closing and locking the gate was necessary to prevent unauthorized persons from entering the property, to protect against theft, and to control livestock during periods of active grazing. Thus, beginning in October 2020, plaintiffs began locking the main gate with a chain and padlocks. Plaintiffs provided all users (including defendant) with keys and combinations to the locks and demanded that they keep the gate closed and locked at all times. Plaintiffs also provided keys and/or combinations to other family members, the fire department, and the utility company.

11

Plaintiffs also erected another gate—the "barnyard gate"—that had once been installed on the property between the barn and the blacksmith shop. Plaintiffs claimed that closing and locking the barnyard gate was necessary to protect the barn and its contents; to contain any stray livestock; and to prevent persons authorized to use only the Main House Roadway Easement from using the JJ McSorley/Lower House Easement. As with the main entrance gate, plaintiffs provided keys and/or combinations to all users, including defendant, and demanded that the barnyard gate be kept closed and locked whenever it was not in use. Defendant complied with plaintiffs' request to close and lock the gates for about six weeks. Thereafter, defendant rarely closed the gates and almost never locked them.

Plaintiffs asserted that defendant, as the owner of the dominant tenement, has a duty to keep the gates closed and locked. Plaintiffs asserted that the burden of closing and locking the gates is minimal, less than a minute per gate.

Defendant's witnesses testified that historically the gates were never locked and were closed only when moving cattle. The lone exception was the period after her mother died, when the gates were temporarily kept closed because no one was living on the property. Defendant initially complied with plaintiffs' request to close and lock the gates because of plaintiffs' letter. However, after consulting with counsel, defendant did not believe that she had any legal obligation to close or lock the gates. Nevertheless, as an accommodation, defendant and her tenant agreed that they generally would try to close the main gate at night and lock the main gate if they both were going to leave the Ranch for more than four hours.

Defendant did not feel safe locking the main gate at night because it might prevent her from evacuating quickly in the event of an emergency. Defendant's tenant testified that it was unduly burdensome for her to close and lock the gates because it takes her about four minutes and thirty seconds to get through the gates every time she leaves the property. Defendant testified that closing and locking the gates interfered with her use

12

and enjoyment of her property because it inconvenienced her and her guests, discouraged visitors, and prevented her from receiving deliveries. Defendant believed that plaintiffs' insistence on closing and locking the gates was a form of harassment.

Michael Dell'Orto, the Mokelumne Hill Fire Protection District Chief, testified that locked gates *could* pose a safety hazard in the event of a fire or medical emergency. He testified that a manual gate had never prevented fire crews from responding to a fire but noted that gates add to the response time and, in an emergency, "every little minute counts."

4.      *The Surveillance Cameras*

Celeste testified that she installed security cameras in various locations around Parcel C-2. The cameras were "wildlife" cameras that captured images (or videos) when triggered by a motion sensor. When activated, the cameras would transmit an image to a cell phone, while retaining the photo/video on a memory card within the camera. The cameras were positioned to monitor what plaintiffs considered the "high-risk areas" of their property, which included the barn and the Main House Roadway Easement and JJ McSorley/Lower House Easement. The purpose of the cameras was to protect the property from theft, and to "document [defendant's] trespass and easement violations." As plaintiffs' agent, Celeste was primarily responsible for monitoring the security cameras and reviewing the photos/videos. Plaintiffs produced over 255,000 security camera images during pre-trial discovery. The images included numerous photos of defendant (or her tenant or guests) walking or standing on the Easements, as well as photos of dogs on the Easements. In addition to the security cameras, plaintiffs or their agents occasionally used a handheld camera or a cell phone to photograph or video record defendant or her guests while they were using the Easements.

Defendant testified that the security cameras and the surveillance by plaintiffs made her and her guests uncomfortable. Defendant testified that she never consented to the security cameras and believed the surveillance was an invasion of her privacy.

13

### 5. *The "No Trespassing" Signs*

In addition to the security cameras, plaintiffs posted multiple "no trespassing" signs throughout their property, including on the main entrance gate, at the intersection of the Easements, and the barn. A "no trespassing" sign was positioned near every security camera so that visitors would encounter the cameras and signs together. Each sign reads: "NO TRESPASSING[.] [¶] Violators will be Prosecuted. [¶] Right to pass by permission and subject to control of owner. [¶] CPC § 602 | CC § 1008." Below that, each sign includes the name "GARAMENDI McSORLEY RANCH, LLC," and a telephone number that belonged to Katherine. The signs did not refer to defendant or provide any contact information for her. At trial, plaintiffs' witnesses testified that the purpose of the signs was to preserve plaintiffs' ability to enforce trespass violations, not to harass defendant.

Defendant admitted that plaintiffs have a right to post "no trespassing" signs on their property, but defendant argued that plaintiffs should not be allowed to post "no trespassing" signs on the Easements, especially at the main entrance gate. Defendant testified that posting "no trespassing" signs on the Easements discouraged visitors and interfered with her use of the Easements. Defendant considered the signs to be another form of harassment.

### D. *Trial Court's Ruling*

After the trial, the trial court issued a tentative decision, which was mostly in defendant's favor. Plaintiffs lodged numerous objections. The court held a hearing on the objections and thereafter issued its Statement of Decision.

The Statement of Decision generally holds that (1) the Easements may be used to travel directly between Parcel C-1 and Parcels D-1 and C-3; (2) the Easements may be used by pedestrians accompanied by dogs, by unaccompanied children, and for "recreational" activities, temporary parking, and incidental/transitory stops; (3) closing and locking the gates is an undue burden on the dominant estates and therefore plaintiffs

14

may not obstruct the Easements by closing and locking the gates (except that plaintiffs may close the gates when necessary to control livestock or horses); (4) plaintiffs may use security cameras to monitor their property, but plaintiffs may not retain images of defendant, her tenant, her family members, or known invitees unless plaintiffs believe, in good faith, that the images provide evidence of a trespass or other violation of rights; (5) cell phones, handheld cameras, and other electronic recording devices may not be used to photograph defendant, her tenant, her family members, or her known invitees while they are lawfully using the Easements; (6) plaintiffs' "no trespassing" signs are misleading and potentially a deterrence to defendant's visitors and therefore plaintiffs may post such signs anywhere on their property *except* the Easements. The remainder of the Statement of Decision relates to the cost of fencing issue, which is not at issue in this appeal.

The parties subsequently stipulated to dismiss the remaining causes of action and allow judgment to be entered on the Statement of Decision. The trial court entered judgment on May 10, 2024. The Judgment specifically provides, in relevant part:

"a. [Defendant], her tenant(s), and their invitees are entitled to travel along the Main House Roadway Easement and the JJ McSorley (Parcel D-1) and Lower House (Parcel C-3) Roadway Easement … whatever distance is appropriate to her or their purposes, and may travel along one easement to reach another easement and then travel along that easement for whatever distance is appropriate to her or their purposes. They have the right to use both roadways and may use them in tandem to reach any property [defendant] owns or any location to which she holds access rights (including, without limitation, the Main House, the JJ McSorley House, the Blacksmith Shop, the North C-1 Vineyard, her mailbox, or Highway 49). That includes the right to use part or all of an easement appropriate to their purposes of travel. They are not required to traverse the entire length of an easement or to exit to Highway 49 when ingressing or egressing from a location.

"b. [Defendant], her tenant(s), and their invitees are not prohibited from using [the Easements] for recreational purposes….

"c. [Defendant], her tenant(s), and their invitees are not prohibited from temporarily stopping, ceasing to move, or 'loitering' as [p]laintiffs have characterized that term, (i.e., stopping or ceasing to move for purposes other than for an emergency, mechanical problem, disability, or to open or close gates) on [the] Easements.

"d. [Defendant], her tenant(s), and [their] invitees may be accompanied by dogs while utilizing the [E]asements but may not allow dogs to roam onto portions of Parcel C-2 over which [defendant] does not have easement or access rights.

"e. Children of [defendant], her tenant(s), or their invitees may ingress or egress over [the] Easements or any portion thereof, whether accompanied or supervised by an adult or not.

"f. [Defendant], her tenant(s), and [their] invitees may stop or park their vehicles on [the] Easements while visiting the Blacksmith Shop and may otherwise park temporarily on those [E]asements to effectuate the purpose of a visit that is permitted by the [E]asement.

"g. [ … ] Plaintiffs may close the gates only when their or their tenant's livestock or horses are present and then only when necessary to control them.… Other than that, [d]efendant and her invitees are entitled to the use of the easements unburdened by closed or locked gates and Plaintiff may not close or lock the gates.

"h. Plaintiffs may continue to use their security cameras. However, whenever those cameras capture images of [defendant], her tenant(s), their family members, or persons known to be her invitees, the [p]laintiffs and their agents must … retain only those [images] that they believe, in good faith, provide evidence of a trespass or other violation of their rights…. Plaintiffs and their agents may not use cell phones, cameras, or other handheld electronic devices to photograph or record [defendant], her tenant(s),

16

their family members, or their known invitees while they are engaged in lawful use of [the] Easements.

"i. [Defendant's] invitees' travel over [the] Easements is neither by permission nor subject to the control of Plaintiffs, and (contrary to the signs posted by [p]laintiffs) her invitees may not be prosecuted for using those [E]asements consistent with this judgment.  Plaintiffs may post their property by placing signs anywhere on Parcel C-2 *except* the easements.  They may not post such 'no trespassing' signs on the [E]asements….  Any such signs on the [E]asements must be removed and not replaced."

After judgment, the trial court found defendant to be the prevailing party and awarded her costs and attorney's fees.  Plaintiffs' motion for a new trial was denied.  Plaintiffs filed timely notices of appeal of the judgment, the order denying plaintiffs' motion to tax costs, and the award of attorney's fees.

## DISCUSSION

### I

### *Legal Principles and Standard of Review*

A.      *General Rules of Contract Interpretation*

The issue in this appeal is whether the trial court properly construed the terms of the parties' Settlement agreement and resulting easements.  We interpret these instruments under the same rules of construction that apply to contracts generally.  (See *Winet v. Price* (1992) 4 Cal.App.4th 1159, 1165 [settlement agreement] (*Winet*); *Zissler v. Saville* (2018) 29 Cal.App.5th 630, 639 [easement] (*Zissler*).)

The fundamental goal of contract interpretation is to give effect to the mutual intention of the parties at the time of contract formation.  (Civ. Code, § 1636.)  To ascertain that intent, we look first to the language of the contract, construing the words in the context of the instrument as a whole and the circumstances under which it was made.  (*Dameron Hospital Assn. v. AAA Northern California, Nevada & Utah Ins. Exchange* (2014) 229 Cal.App.4th 549, 567; Civ. Code, §§ 1639, 1641, 1647.)  We give words their

17

ordinary and popular meaning, unless the words are used in a technical sense or a special meaning is given to them by usage. (*Dameron Hospital Assn.,* at p. 567; Civ. Code, § 1644.) If contractual language is clear and explicit, and does not involve an absurdity, it will be followed. (*Dameron Hospital Assn.,* at p. 567; Civ. Code, § 1638.) But if the language is ambiguous, extrinsic evidence may be admissible to explain or interpret the agreement. (See *Wolf v. Superior Court* (2004) 114 Cal.App.4th 1343, 1350 (*Wolf*).)

"The test of whether [extrinsic] evidence is admissible to construe an ambiguity is not whether the language appears to the court to be unambiguous, but whether the evidence presented is relevant to prove a meaning to which the language is 'reasonably susceptible.' " (*Winet, supra*, 4 Cal.App.4th at p. 1165, citing *Pacific Gas & Electric Co.* v. *G. W. Thomas Drayage & Rigging Company* (1968) 69 Cal.2d 33, 37.)

When the meaning of a contract is disputed, the decision whether to admit extrinsic evidence involves a two-step process. First, the court provisionally receives any proffered extrinsic evidence to determine whether the language of the contract is "reasonably susceptible" to the interpretation urged. (*Wolf, supra*, 114 Cal.App.4th at p. 1351.) If the court decides that it is, the extrinsic evidence is admitted to aid in the second step, which involves interpreting the contract. (*Ibid*.)

The mutual intention of the parties is determined by their objective manifestations of intent. (*In re Marriage of Minkin* (2017) 11 Cal.App.5th 939, 948; *G & W Warren's, Inc. v. Dabney* (2017) 11 Cal.App.5th 565, 575, 577.) A party's unexpressed subjective intent is irrelevant to determining the meaning of contractual language. (*G & W Warren's, Inc.,* at pp. 575,577; *Salehi v. Surfside III Condominium Owners' Assn.* (2011) 200 Cal.App.4th 1146, 1159.)

The threshold determination of ambiguity is a question of law, subject to our independent review on appeal. (*Wolf, supra*, 114 Cal.App.4th at p. 1351.) The interpretation of a contract also presents a question of law when no extrinsic evidence is introduced, or when the competent extrinsic evidence is not conflicting. (*Ibid*.; *Winet,*

18

*supra*, 4 Cal.App.4th at p. 1166; see *Hess v. Ford Motor Co.* (2002) 27 Cal.4th 516, 527 [where the evidentiary facts are not in conflict, and only the inferences to be drawn therefrom are disputed, review is de novo].) However, if the interpretation of a contract turns on the credibility of conflicting extrinsic evidence, the resolution of that conflict is a question of fact and must be upheld if supported by substantial evidence. (*Wolf,* at p. 1351; *Winet,* at p. 1166; see *ASP Properties Group, L.P. v. Fard, Inc.* (2005) 133 Cal.App.4th 1257, 1266-1267.)

B.    *California's Parol Evidence Rule*

We also must consider the impact of California's parol evidence rule. The rule, codified in Code of Civil Procedure section 1856, prohibits the introduction of extrinsic evidence to vary or alter the terms of an integrated written contract. (*Casa Herrera, Inc. v. Beydoun* (2004) 32 Cal.4th 336, 343; see Civ. Code, § 1625.) An integrated agreement is broadly defined as a writing intended to serve as the "final expression" of the terms of an agreement. (*Hayter Trucking, Inc. v. Shell Western E&P, Inc.* (1993) 18 Cal.App.4th 1, 13.) However, application of the parol evidence rule differs depending on whether the parties intended the writing to be a fully integrated agreement or only a partially integrated agreement. (*Kanno v. Marwit Capital Partners II, L.P.* (2017) 18 Cal.App.5th 987, 999-1000 & fn.2 (*Kanno*).)

When parties intend a writing to be a "final expression" of certain terms, but not to serve as a comprehensive expression of their agreement, the agreement is said to be partially integrated. (See *Kanno, supra*, 18 Cal.App.5th at pp. 999-1000; *Founding Members of the Newport Beach Country Club v. Newport Beach Country Club, Inc.* (2003) 109 Cal.App.4th 944, 953.) For a partially integrated agreement, the parol evidence rule prevents the use of extrinsic evidence to contradict the express terms of the agreement, but allows evidence of consistent additional terms to explain or supplement the agreement. (*Kanno*, at pp. 999-1000; *Founding Members of the Newport Beach Country Club,* at p. 953.)

19

In contrast, when the parties intend the writing to be a "complete and exclusive statement" of the terms of their agreement—i.e., a fully integrated agreement—its terms cannot be supplemented or explained by evidence of consistent additional terms. (*Kanno, supra*, 18 Cal.App.5th at p. 1000.) The parol evidence rule prohibits the introduction of extrinsic evidence, whether oral or written, to vary, alter, or augment the terms of a fully integrated agreement. (*Kanno,* at p. 1000.)

Yet even in the context of a fully integrated agreement, the parol evidence rule does not exclude "evidence of the circumstances under which the agreement was made or to which it relates, … or to explain an extrinsic ambiguity or otherwise interpret the terms of the agreement," provided such evidence is relevant to prove a meaning to which the language of the instrument is reasonably susceptible. (Code Civ. Proc., §§ 1860, 1856, subd. (g); Civ. Code, § 1647; *Continental Baking Co. v. Katz* (1968) 68 Cal.2d 512, 522; accord, *Epic Communications, Inc. v. Richwave Technology, Inc.* (2015) 237 Cal.App.4th 1342, 1354-1355; *Rosenfeld v. Abraham Joshua Heschel Day School, Inc.* (2014) 226 Cal.App.4th 886, 897-898; *Lonely Maiden Productions, LLC v. GoldenTree Asset Management, LP* (2011) 201 Cal.App.4th 368, 376.)

C.      *The Law of Easements*

An easement is a nonpossessory interest in the land of another that gives the easement holder the right to use the land of another or to prevent the property owner from using his or her land. (*Beyer v. Tahoe Sands Resort* (2005) 129 Cal.App.4th 1458, 1472.) An easement differs from a license in that, while both confer the right to use another's land, a license confers no interest in the premises and is generally revocable at will. (See *Guerra v. Packard* (1965) 236 Cal.App.2d 272, 285; *Fisher v. General Petroleum Corp.* (1954) 123 Cal.App.2d 770, 776; cf. *Belmont County Water Dist. v. State of California* (1976) 65 Cal.App.3d 13, 17 [discussing irrevocable licenses].) In contrast, an easement creates an incorporeal right to enter and use land in the possession of another and obligates the possessor not to interfere with the uses authorized by the easement.

20

(Rest.3d Property, Servitudes, § 1.2(1); *Moylan v. Dykes* (1986) 181 Cal.App.3d 561, 568.)  Further, while a license may be created through an oral agreement or by any act of the licensor sufficient to show his assent, an easement can be created only by grant (express or implied) or by prescription.  (*Eastman v. Piper* (1924) 68 Cal.App. 554, 560-561; *Batta v. Hunt* (2024) 106 Cal.App.5th 295, 305; *Cushman v. Davis* (1978) 80 Cal.App.3d 731, 735.)

Easements are classified as either appurtenant or in gross.  (*Moylan v. Dykes, supra*, 181 Cal.App.3d at p. 568.)  " 'An easement is *appurtenant* when it is attached to the land of the owner of the easement, and benefits him as the owner or possessor of that land.  The land to which it is attached is called the *dominant tenement*, and the land which bears the burden, i.e., the land of another which is used or enjoyed, is called the *servient tenement*.  [Citations omitted.]  [¶]  An easement *in gross* is not attached to any particular land as dominant tenement, but belongs to a person individually.' "  (*City of Anaheim v. Metropolitan Water Dist. of Southern California* (1978) 82 Cal.App.3d 763, 767.)  This distinction becomes important when the owner of an easement conveys his property.  (*Moylan,* at p. 568.)  Because an easement appurtenant attaches to the dominant tenement, it passes with a transfer of the land, unlike an easement in gross, which does not.  (*Ibid*.)

Where an easement has been created by grant, the scope and extent of the easement is to be determined by the terms of the grant.  (*Schmidt v. Bank of America, N.A.* (2014) 223 Cal.App.4th 1489, 1499; *Keeler v. Haky* (1958) 160 Cal.App.2d 471, 474; Civ. Code, § 806.)  If the grant is clear and specific in its terms, it is decisive of the limits of the easement.  (*Wilson v. Abrams* (1969) 1 Cal.App.3d 1030, 1034.)  If the easement is not specifically defined, its scope will be construed to include whatever is

reasonably necessary and convenient for the purpose for which it was created.[5]  (*Ibid.*; accord, *Pear v. City and County of San Francisco* (2021) 67 Cal.App.5th 61, 75.) Consideration may be given not only to actual uses being made at the time of the grant, but also to future uses within the reasonable contemplation of the parties at the time of the conveyance.  (*Maywood Mutual Water Co. No. 2 v. City of Maywood* (1972) 23 Cal.App.3d 266, 270-271; *Pear,* at p. 71.)

In construing an instrument conveying an easement, the rules applicable to the construction of deeds generally apply.  (*Scruby v. Vintage Grapevine, Inc.* (1995) 37 Cal.App.4th 697, 702 (*Scruby*); Civ. Code § 1066.)  As with any other contract, the primary object is to ascertain and carry out the intention of the parties.  (*City of Manhattan Beach v. Superior Court* (1996) 13 Cal.4th 232, 238.)  The intention of the parties is to be gathered, if possible, from the instrument itself.  (*Norris v. State* (1968) 261 Cal.App.2d 41, 46.)  If the language in the conveyance is clear and explicit, there is no occasion for the use of extrinsic evidence to show the nature and extent of the rights acquired.  (*Scruby,* at p. 702; *Van Klompenburg v. Berghold* (2005) 126 Cal.App.4th 345, 349.)  However, if the language is ambiguous, extrinsic evidence may be used as an aid to interpretation, unless such evidence imparts a meaning to which the instrument creating the easement is not reasonably susceptible.  (*Van Klompenburg,* at p. 349; *Wolf, supra,* 114 Cal.App.4th at pp. 1350-1351.)  In cases of doubt, not removed by other rules of construction, Civil Code section 1069 declares that an affirmative grant of easement is to be liberally construed in favor of the grantee.  (*City of Manhattan Beach* at pp. 242-243; *Norris,* at pp. 46-47; *Los Angeles v. Howard* (1966) 244 Cal.App.2d 538, 545.)

---

[5]     Every easement includes "secondary easements" consisting of the right to do acts that are reasonably necessary for the full enjoyment of the easement itself.  (*Bernstein v. Sebring* (2025) 116 Cal.App.5th 1264, 1270; see *Rye v. Tahoe Truckee Sierra Disposal Co., Inc.* (2013) 222 Cal.App.4th 84, 92 [where an easement is founded upon a grant, only the interests expressed in the grant and those necessarily incident thereto pass from the owner of the fee].)

" ' "The rights and duties between the owner of an easement and the owner of the servient tenement … are correlative.  Each is required to respect the rights of the other.  Neither party can conduct activities or place obstructions on the property that unreasonably interfere with the other party's use of the property." ' " (*Inzana v. Turlock Irrigation Dist. Bd. of Directors* (2019) 35 Cal.App.5th 429, 444-445.)  "Thus, the easement holder must exercise his or her right so as not to impose an unnecessary burden on the servient tenement, and the owner of the servient tenement may make any use of the property that does not [interfere unreasonably] with the easement." (12 Witkin, Summary of Cal. Law (11th ed. 2018) Real Property, § 426; *Scruby, supra*, 37 Cal.App.4th at pp. 702-703, 706; accord, *Thorstrom v. Thorstrom* (2011) 196 Cal.App.4th 1406, 1422; see *Locklin v. City of Lafayette* (1994) 7 Cal.4th 327, 356, fn. 17 [property laws forbid unreasonably overburdening an easement or servitude].)  Whether a particular use of property constitutes an unreasonable interference with the rights of the dominant or servient tenement presents a question of fact to be resolved by the trier of fact, whose determination will be upheld on appeal if supported by substantial evidence.  (*Scruby,* at pp. 703, 705-706; *Jordan v. Worthen* (1977) 68 Cal.App.3d 310, 327.)

       D.    *Right of Way Easement*

     A right-of-way is a type of easement that may be created by grant.  (*Vieira Enterprises, Inc. v. McCoy* (2017) 8 Cal.App.5th 1057, 1075; Civ. Code, § 802)  At its most basic level, a right of way is an easement that confers a right to pass over another's land.  (*Beyer v. Tahoe Sands Resort, supra*, 129 Cal.App.4th at p. 1472, fn. 16; *Miro v. Superior Court* (1970) 5 Cal.App.3d 87, 96.)  When a right-of-way is granted in broad, unrestricted terms, the easement ordinarily will be construed as creating a general right-of-way capable of use for all reasonable roadway purposes.  (*Zissler, supra*, 29 Cal.App.5th at pp. 634, 640-641; *Scruby, supra*, 37 Cal.App.4th at p. 703; *Wall v. Rudolph* (1961) 198 Cal.App.2d 684, 692.)  However, the scope of the easement

ultimately is determined by the terms of the grant. (*Van Klompenburg v. Berghold, supra*, 126 Cal.App.4th at p. 349.) When the language of the easement is clear and explicit, it will be followed. (*Id*. at pp. 349-350; *Wilson v. Abrams, supra*, 1 Cal.App.3d at p. 1034.)

II

*Admission of Extrinsic Evidence*

Plaintiffs contend that the trial court committed reversible error in admitting extrinsic (parol) evidence to assist in interpreting the Settlement agreement and Easements. We find no reversible error.

A.    *Additional Background*

Before trial, plaintiffs moved in limine to exclude extrinsic evidence offered to explain the meaning of the Settlement and related Easements. Among other things, plaintiffs argued that the language of the Settlement was clear and unambiguous and therefore extrinsic evidence was inadmissible to alter or vary its terms.[6] The trial court deferred ruling on the motions pending trial.

At the end of trial, plaintiffs filed a renewed motion in limine to exclude specific testimony relating to historical uses of the property and the parties' subjective understandings of the Settlement. The post-trial motion argued the evidence was inadmissible, either because it did not support an interpretation to which the Settlement was reasonably susceptible, or because the witness's unexpressed, subjective understanding of the agreement was irrelevant. Notably, the post-trial motion did *not* argue that extrinsic evidence is inadmissible because the Settlement is a fully integrated agreement that expressly bars use of extrinsic evidence to explain its terms. When

---

[6]    Plaintiffs' third motion in limine referenced the Settlement agreement's integration clause in the "background" (capitalization and underline omitted) section of the motion but did not discuss it in the "argument" (capitalization and underline omitted) section of the motion.

24

plaintiffs tried to raise that issue at the hearing on the motion, defendant objected that the issue had not been briefed and therefore was not properly before the court.

After the hearing, the trial court granted plaintiffs' motion in part. The court struck certain testimony but otherwise denied the motion. In announcing its ruling, the trial court added that it would "take care not to use any of [the] evidence to add to or vary the terms of the [E]asements." The trial court did not address the Settlement's integration clause in ruling on the motion or in its subsequent Statement of Decision. Plaintiffs did not raise the integration clause as an issue in their objection to the trial court's tentative decision or in their motion for a new trial.

B.    *Analysis*

Plaintiffs contend the trial court should not have considered evidence relating to the historical use of the Ranch property; the relationships between the family members; the circumstances surrounding the Settlement; or the parties' unexpressed, subjective beliefs about the meaning of the Settlement agreement. Plaintiffs contend that such evidence is barred by the Settlement's integration clause, the parol evidence rule, and general rules of contract interpretation.

1.    *The Integration Clause*

As a threshold matter, we address plaintiffs' contention that the trial court should not have admitted any extrinsic evidence because of language in the Settlement's integration clause stating that "no extrinsic evidence whatsoever may be introduced in any judicial proceeding … involving this [a]greement." We conclude that whatever merit this argument might have, plaintiffs forfeited the contention by failing to adequately raise it before the trial court. The reason for the forfeiture rule is self-evident. It would be unfair, both to the trial court and the opposing party, to permit a change of theory on appeal. (*Hewlett-Packard Co. v. Oracle Corporation* (2021) 65 Cal.App.5th 506, 548.) Here, plaintiffs' post-trial motion did not mention the integration clause, and their attempt to raise it at the hearing on the motion came too late. (*Starzynski v. Capital Public Radio*

25

(2001) 88 Cal.App.4th 33, 38, fn. 2.) Accordingly, we deem this argument—which the trial court did not address—as forfeited. (*SCI California Funeral Services, Inc. v. Five Bridges Foundation* (2012) 203 Cal.App.4th 549, 564 [evidentiary objection must raise precise ground asserted on appeal]; *Platzer v. Mammoth Mountain Ski Area* (2002) 104 Cal.App.4th 1253, 1260 [same]; *People v. Rivera* (2011) 201 Cal.App.4th 353, 361 [same]; *Walker v. Nitzberg* (1970) 13 Cal.App.3d 359, 365 [same]; see also *Christ v. Schwartz* (2016) 2 Cal.App.5th 440, 452 [renewal of objection is required when the court has not finally ruled on it]; *People v. Ennis* (2010) 190 Cal.App.4th 721, 736 [same].) This renders it unnecessary for us to decide whether the parties intended to render extrinsic evidence inadmissible for any reason, as plaintiffs contend, or merely intended to invoke the stricter version of the parol evidence rule that applies to fully integrated agreements. (See *Rosenfeld v. Abraham Joshua Heschel Day School, Inc., supra*, 226 Cal.App.4th at p. 897; *Casa Herrera v. Beydoun, supra*, 32 Cal.4th at p. 343; *Continental Baking Co. v. Katz, supra*, 68 Cal.2d at p. 522.)

2. *Extrinsic Evidence to Resolve an Ambiguity*

We next turn to plaintiffs' contention that the trial court erred in admitting extrinsic evidence because the Settlement/Easement language was clear and unambiguous (i.e., the proffered evidence was not relevant to prove a meaning to which the language was reasonably susceptible). (*Winet, supra*, 4 Cal.App.4th at p. 1165.) Plaintiffs argue that the extrinsic evidence was inadmissible because the Easements are not reasonably susceptible to an interpretation allowing non-travel related uses such as recreation, parking, etc. We agree in part.

To determine whether an express easement is ambiguous, we begin with the language of the grant deed. If the language in the conveyance is clear and explicit, there is no need to resort to extrinsic events to show the nature and extent of the rights acquired. (*Scruby, supra*, 37 Cal.App.4th at p. 702.)

26

Here, the relevant portion of the grants for the Main House Roadway Easement and Vineyard Roadway Easement provide that they are "solely for the purpose for providing ingress and egress to Parcel C-1 for pedestrians, street-legal registered vehicles, construction equipment or persons on horseback." Likewise, the JJ McSorley/Lower House Easement provides that it is "solely for the purpose for providing ingress and egress to Parcel C-3 and D-1 for pedestrians, street-legal registered vehicles, construction equipment or persons on horseback."

Plaintiffs argue that the phrase "ingress and egress" is clear and unambiguous and therefore extrinsic evidence cannot be used to augment or vary its terms. In general, we agree that there is no ambiguity about the meaning of an easement for "ingress and egress." An easement for ingress and egress gives the easement holder the right to use another's land to enter and leave its property. (*Zissler, supra*, 29 Cal.App.5th at pp. 639-640; see Rest.3d Property, Servitudes, § 4.10, com. d.) Thus, as applied to the facts of this case, defendant unambiguously has the right to use the Easements for the purpose of entering and exiting her properties.

The addition of the phrase "for pedestrians, street-legal registered vehicles, construction equipment or persons on horseback" is a qualification of, or limitation on, that right, specifying the allowable means of travel. (See *Schmidt v. Bank of America, N.A.* (2014) 223 Cal.App.4th 1489, 1500.) It does not expand the permissible uses or alter the underlying purpose of the Easements. (*Ibid.*; *Zissler, supra*, 29 Cal.App.5th at p. 640.) Accordingly, extrinsic evidence generally was not required to ascertain the intent of the parties. Whether the defendant's uses of the roadway are allowed under the Easements should have been determined by asking whether those uses are reasonably necessary for and consistent with the purpose for which the Easements were granted, which is "ingress and egress." (*Zissler* at p. 641; *Bernstein v. Sebring, supra*, 116 Cal.App.5th at p. 1270; *Rye v. Tahoe Truckee Sierra Disposal Co., Inc., supra*, 222 Cal.App.4th at p. 92.) We discuss this point more fully *infra*.

27

However, we find that the Easements are ambiguous in one respect, namely, about whether they permit defendant to use the Easements in tandem to travel directly between her properties, as defendant contends, or whether they only allow her to travel to/from Highway 49, as plaintiffs contend. The language of the Easements is reasonably susceptible to both interpretations. Indeed, this very ambiguity is the genesis of this lawsuit. Hence, we conclude the trial court properly admitted and considered extrinsic evidence to assist it in ascertaining the intention of the parties on this issue.

3. *Evidence of Subjective, Unexpressed Beliefs or Intent*

To the extent plaintiffs contend that the trial court erred by considering defendant's unexpressed, subjective beliefs about the meaning of their agreement, we conclude plaintiffs have forfeited the contention by failing to support it with meaningful legal analysis and proper citations to the record. "An appellant has the burden to demonstrate reversible error with reasoned argument and citation to authority. [Citations.] When an appellant asserts a point but fails to support it with reasoned argument and citations to authority, we treat the point as forfeited." (*Tellez v. Rich Voss Trucking, Inc.* (2015) 240 Cal.App.4th 1052, 1066.) It is not our responsibility to comb the record for facts, or to conduct research in search of authority, to support an appellant's contentions on appeal. (*Meridian Financial Services, Inc. v. Phan* (2021) 67 Cal.App.5th 657, 684.) Plaintiffs failed in their opening brief to identify the specific testimony on which the trial court allegedly relied, nor have they explained how any such errors were prejudicial. Accordingly, we treat the argument as forfeited and decline to consider it further.

4. *Harmless Error*

Defendant argues that even if the trial court erred by considering extrinsic evidence as an aid to the interpretation of the Easements, the error was harmless. We agree. Excluding the evidence relating to the route of travel, the extrinsic evidence relied upon by the trial court consisted of the following: evidence that the Easements were

28

negotiated in the context of a family dispute; evidence that plaintiffs knew defendant had children and grandchildren; and evidence that plaintiffs knew defendant and her family had dogs. The probative value of this evidence was minimal. Accordingly, we do not find it reasonably probable that a result more favorable to plaintiffs would have been reached in the absence of the error. (*Red Mountain, LLC v. Fallbrook Public Utility Dist.* (2006) 143 Cal.App.4th 333, 348.)

## III

### *Plaintiffs' Overburdening Claims*

We now turn to the question of whether the trial court correctly interpreted the Easements and denied plaintiffs' requests for declaratory relief regarding alleged overburdening of the Easements. We conclude that the trial court correctly interpreted the Easements as allowing travel directly between parcels, but erred in interpreting the Easements to permit recreational, parking, loitering/lingering, and open space uses. We also conclude that the trial court acted within its discretion in declining to grant declaratory relief regarding the presence of unsupervised dogs on the Easements.

A. *Travel Between Parcels*

Plaintiffs argue the Easements do not allow defendant to travel directly between parcels. In plaintiffs' view, because the "sole" purpose of each Easement is to provide ingress and egress for a particular benefitted parcel, the Easements only allow travel between Highway 49 and that benefitted parcel.

In its Statement of Decision, the trial court disagreed. It concluded that the Easements may be used to travel directly between parcels and do not restrict the defendant to traveling from/to Highway 49. In reaching this conclusion, the court considered the language of the Easements, the surrounding circumstances (including historical use of the roadway and the characteristics of the dominant and servient tenements), and the requirements of the grantee. The court also considered the statutory requirement that, in doubtful cases, a deed grant is to be interpreted in favor of the

29

grantee.[7] (Civ. Code, § 1069; *Walton v. City of Red Bluff* (1991) 2 Cal.App.4th 117, 124.) Regarding travel between Parcels C-1 and D-1/C-3, the court concluded that defendant essentially has two rights: "the right to ingress and egress along the Main House Roadway Easement" and "the right to ingress and egress along the [JJ McSorley/Lower House Easement]." Thus, if defendant wishes to go from her house on Parcel C-1 to her house on Parcel D-1, she may egress from Parcel C-1, travel along the Main House Roadway Easement, then turn left and ingress to Parcel D-1 along the JJ McSorley/Lower House Easement. The court found nothing in the language of either Easement that would require defendant to "travel the full length of the [E]asement to use it."

Because the material facts are not in dispute, we do not defer to the trial court's interpretation and we independently construe the Easements. (*Winet, supra*, 4 Cal.App.4th at p. 1166, fn. 3; *Wolf, supra,* 114 Cal.App.4th at p. 1351.) Nevertheless, in our independent judgment, the trial court's interpretation is correct.

As the trial court observed, at the time of the Settlement, all parties understood that defendant would own houses on both Parcel C-1 and D-1 and that the only way to travel between her properties (without permission from Parcel C-3's owner) would be to use the Easements. Since there is nothing in the Easements requiring the easement holders to travel the length of the Easement to/from Highway 49, it simply is not reasonable to read the Easements as prohibiting defendant from travelling directly between her properties, as occurred before the Settlement. Indeed, it would be

---

[7] Plaintiffs argue that this statutory requirement is counterbalanced by the rule that, in cases of uncertainty, the interpretation of a written instrument should be construed most strongly against the party who caused the uncertainty to exist. (Civ. Code, § 1654.) We disagree that Civil Code section 1654 has any application here since all the parties were involved in negotiating and drafting the Settlement, which dictated the language of the Easements. Defendant cannot be said to have "caused" the uncertainty in the language, even if she served as the scrivener for the Easements.

impossible for defendant to use the Vineyard Roadway Easement without also using at least one of the other Easements in tandem.

Plaintiffs argue that their interpretation is compelled by language in the Main House Roadway Easement—but not the other Easements—stating, "This easement shall allow access to Parcel C-1 only at and through a gate at its termination at Parcel C-1 at the base of the hill and shall not allow access to C-1 at any other point along the roadway easement." We disagree. As the trial court held, this language merely describes where defendant may access Parcel C-1 from the Main House Roadway Easement. It means only that when defendant returns to Parcel C-1 along the Main House Roadway Easement she must access her property through the gate at the base of the hill, and not at any other point along the easement.

In sum, we hold that the most reasonable interpretation of the Easements is that they permit the dominant tenement owners to use the Easements together to "egress" from one parcel and "ingress" to another, without first making a pointless diversion to Highway 49.[8] The trial court properly denied plaintiffs' request for declaratory relief that the Easements are only for purposes of travel to/from Highway 49.

We note, however, that the judgment declares defendant has the right to travel along the Easements "whatever distance is appropriate to her … purposes," without any language qualifying or limiting such "purposes." As a result, we find this part of the judgment to be overbroad. Accordingly, we shall remand this matter for the trial court to either strike the offending language or modify it to make clear that defendant may only use the Easements for purposes of "ingress and egress."

---

[8] Although we have relied on extrinsic evidence in reaching this conclusion, our interpretation would have been the same even if it were based solely on the face of the written instruments.

31

B.     *Non-travel Uses*

Plaintiffs also requested declaratory relief that defendant is prohibited from using the Easements for non-travel related purposes, by which they mean recreational activities, loitering/lingering, unauthorized parking, and use by unaccompanied children or pets (the "challenged uses").

In deciding whether these challenged uses are permitted by the Easements, we have not considered any extrinsic evidence as an aid to interpret the Easements.  We ask only whether the challenged uses are reasonably necessary for the purpose for which the Easements were granted (i.e., ingress and egress), a question of law.  (*Zissler v. Saville, supra*, 29 Cal.App.5th at p. 641; *Bernstein v. Sebring, supra*, 116 Cal.App.5th at p. 1270; *Rye v. Tahoe Truckee Sierra Disposal Co., Inc., supra*, 222 Cal.App.4th at p. 92; *Faus v. City of Los Angeles* (1967) 67 Cal.2d 350, 361.)

Before turning to the merits, however, it is important to note that plaintiffs' claims were made in the context of their argument that the Easements only permit travel to/from Highway 49.  For example, plaintiffs did not contend that defendant could not walk her dog from Parcel C-1 to Highway 49.  Instead, plaintiffs argued that defendant could not use the Easements to walk her dog from Parcel C-1 directly to Parcel D-1 without first diverting to Highway 49 and could not walk her dog on the Easements for a non-ingress/egress purpose, such as exercise.  In plaintiffs' view, the Easements must be used *solely* for the purpose of travelling from the benefitted parcel to/from Highway 49, and for no other purpose.  Because we disagree with the premise of plaintiffs' claim regarding travel to/from Highway 49, it is unnecessary to address any arguments that rely on that premise.  We need only decide whether the challenged uses are permitted by the Easements as we (and the trial court) have interpreted them, as allowing travel directly between parcels.

In denying plaintiffs' request for declaratory relief, the trial court reasoned that the roadway is "more equivalent" to a "driveway" than a thoroughfare, and therefore

defendant may engage in any of the challenged uses after "egressing her property." In short, the court isolated "egress" from "ingress and egress" and determined that "[o]ne can egress" a property for many reasons. The trial court ruled that any uses not expressly prohibited by the Easements are necessarily allowed. Thus, the court ruled that defendant "can egress her property" for the purpose of "stretching her legs," "adding to her step count," or merely "to observe the stars," among other uses.

Plaintiffs complain that the practical effect of the trial court's decision is to rewrite the Easements to include recreational, parking, and open space uses. We agree.

By their terms, the Easements were intended to grant non-exclusive easements appurtenant to the benefitted property "for ingress and egress *over, across and through*" the burdened property. (Italics added.) This language creates a right to pass or travel over the burdened property for ingress and egress, not a right to control that property or to linger on the property for recreational, pleasure-seeking, or other purposes. (*Zissler, supra,* 29 Cal.App.5th at pp. 634, 640; see *Coleman v. Forister* (Tex. 1974) 514 S.W.2d 899, 903; see also *Beyer v. Tahoe Sands Resort, supra*, 129 Cal.App.4th at p. 1472, fn. 16.)

This does not mean that defendant is necessarily prohibited from engaging in recreational or pleasure-seeking activities while she is on the Easements, but it does mean that such activities are permissible only *if and when* defendant is using the Easements for ingress and egress. The trial court's ruling ignores this important distinction, allowing defendant to use the Easements for "recreational purposes," including "any activity undertaken for exercise, relaxation, diversion, sport, or pleasure," regardless of whether defendant is using the Easements for ingress and egress. This was an error.[9]

---

[9] While our decision means unaccompanied children do not have a right to use the Easements as a recreational play area, we agree with the trial court that nothing in the Easements prohibits unaccompanied children from using the Easements for ingress and egress.

The same is true regarding defendant's alleged right to " 'loiter' " or linger on the Easements. The trial court ruled that upon egressing from the dominant estate, nothing prohibits defendant from " 'stopping or ceasing to move' " on the Easements. Not so. The words "ingress and egress" indicate an inherent right to pass over or through the servient estate, but do not imply a right to stop and linger, except as may be reasonably necessary and consistent with the purpose of ingress and egress. (*Zissler, supra,* 29 Cal.App.5th at p. 641.) The trial court erred in suggesting that the Easements give defendant a right to stop and linger on the Easements indefinitely for any lawful purpose, such as to "observe the stars."

Whether defendant has a right to temporarily park on the Easements is a closer question. Some courts have construed an easement for "road" or "roadway" purposes as embracing a right to use the easement for temporary parking provided it does not unduly interfere with the rights of the landowner. (See *Pear v. City and County of San Francisco, supra*, 67 Cal.App.5th at p. 78; *Heath v. Kettenhofen* (1965) 236 Cal.App.2d 197, 204; see also *Keeler v. Haky, supra*, 160 Cal.App.2d at p. 476.) Whatever the merit of these cases, we think this case is distinguishable.

First, although the distinction may be subtle, we believe there is a difference between an easement granted for "roadway purposes" and an easement granted along an existing roadway "solely for the purpose of providing ingress and egress." While a general roadway easement reasonably might encompass temporary parking as an incidental use, we hold that an easement granted "solely" for "ingress and egress" conveys a more circumscribed right, one of passage. (See *Scruby, supra*, 37 Cal.App.4th at p. 703; see also *Marra v. Simidian* (N.Y.App.Div. 1981) 79 A.D.2d 1046, 1047.)

Second, there is language supporting the view that a right to temporary parking was not intended to be included in the Easements. Namely, the JJ McSorley/Lower House Easement provides that it shall include, "as an accessory use, two 'back-up areas[,]' " which may be used for "backing up and turning around vehicles," but

expressly "may not be used for parking by Parcels C-3 or D-1." This shows that the parties considered parking along the JJ McSorley/Lower House Easement and elected not to include it as one of the uses expressly permitted by the Easement.

Third, as the trial court observed, the Easements in question concern "private, little-used, rural roads," and there is no evidence that the Easements are wide enough to accommodate parking along their length while remaining passable to other vehicles.

Fourth, the trial court's reliance on the Blacksmith Shop Building Access License is misplaced. Even if we construe the Blacksmith Shop license as granting an implied right to park near the building for purposes of visiting or working on it—which is not unreasonable—that right would constitute an implied parking *license* granted to the "Family Member Owners," not an implied right under the Easements. (See *Bomberger v. McKelvey* (1950) 35 Cal.2d 607, 618.) In sum, we conclude that temporary parking is not reasonably necessary for ingress and egress to the benefitted properties, and therefore, the trial court erred in interpreting the Easements to permit that use.[10]

In contrast, we find no error in the trial court's decision regarding the presence of dogs on the Easements. In the judgment, the trial court held that defendant and her tenant and invitees "may be accompanied by dogs while utilizing the [E]asements but may not allow dogs to roam onto portions of Parcel C-2 over which [defendant] does not have easement or access rights." The trial court also observed in its Statement of Decision that there is a county ordinance generally prohibiting dogs from roaming " 'at large.' " Plaintiffs sought a declaration that unaccompanied dogs are prohibited on the Easements, but we find the trial court was within its discretion in deciding that the requested declaratory relief was not necessary or proper under the circumstances. (Code Civ. Proc.,

---

[10]    Incidental or temporary stops or parking of vehicles is allowed if reasonably necessary for full enjoyment of the Easements, i.e., for ingress and egress.

35

§ 1061; *D. Cummins Corp. v. United States Fidelity & Guaranty Co.* (2016) 246 Cal.App.4th 1484, 1490.)

IV

*Defendant's Unreasonable Interference Claims*

We now turn to the portion of the judgment addressing defendant's unreasonable interference claims, which relate to the use of locked gates, recording devices, and "no trespassing" signs on the Easements.

As discussed, the general rule is that "[e]very incident of ownership not inconsistent with the easement and the enjoyment of the same is reserved to the owner of the servient estate." (*Scruby, supra*, 37 Cal.App.4th at p. 702.) Thus, the owner of the servient estate may make any use of the land so long as it does not interfere unreasonably with the easement. (*Id*. at pp. 702-703.) Whether a particular use by the servient owner is an unreasonable interference with the dominant owner's easement is a question of fact, and a finding upon conflicting evidence must be upheld if supported by substantial evidence. (*Id*. at p. 703.) In assessing whether substantial evidence exists, we view the record in the light most favorable to the prevailing party, giving it the benefit of every reasonable inference and resolving all conflicts in its favor. (*Thorstrom v. Thorstrom, supra*, 196 Cal.App.4th at p. 1417.)

A.    *Locked Gates*

The trial court ruled in defendant's favor on the gate issue, finding that closing and locking the gates unreasonably interfered with defendant's use and enjoyment of the Easements (except that plaintiffs may temporarily close the gates when necessary to control livestock or horses). In support of its conclusion, the trial court found that (1) historically the gates were not locked and were closed only when animals were present; (2) nothing in the Easements authorizes plaintiffs to erect and maintain locked gates; (3) defendant and her tenant testified credibly about the unreasonable burden opening/closing and unlocking/locking the gates imposes on them and their guests, contractors, and

vendors, especially at night and in inclement weather; (4) the benefit to plaintiffs of closing and locking the gates was minimal since plaintiffs do not live on the property, the barn contains only a modest amount of property, and plaintiffs could better protect the barn by other means; (5) plaintiffs failed to show the gates are reasonably necessary to prevent livestock from straying onto their property or Highway 49; and (6) the gates present a safety hazard because they could impede evacuation and/or delay the arrival of emergency personnel. Based on these findings, the court declared that plaintiffs cannot lock the gates and may close the gates only when necessary to control livestock or horses.

Plaintiffs complain that instead of applying the unreasonable interference test, the trial court simply balanced the burden of locked gates against their benefits and concluded that the balance tips in favor of unobstructed passage. We are unpersuaded. The Statement of Decision leaves no doubt that the trial court applied the unreasonable interference test. (See, e.g., Statement of Decision, p. 37 ["Whether plaintiffs' gates 'unreasonably interfere' is the question to be decided here"]) Thus, plaintiffs' argument is but a thinly-veiled attempt to have us reweigh the evidence and reach a different factual conclusion, which is something we cannot do. (*Pope v. Babick* (2014) 229 Cal.App.4th 1238, 1246.)

Our authority begins and ends with a determination whether there is any substantial evidence, contradicted or uncontradicted, in support of the judgment. (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 630-631.) Here, we cannot say the trial court abused its discretion in crediting the testimony of defendant's witnesses regarding the burden of closing and locking the gates and the safety risk posed by keeping the gates closed and locked. Thus, based on the record before us, we are satisfied that there is substantial evidence to support the court's determination that closing and locking the gates unreasonably interfered with defendant's use of the Easements. (See *Howard,* at p. 631 [judgment must be upheld on appeal if it is supported

by substantial evidence, even if there is also substantial evidence to support a contrary conclusion].)

We also reject plaintiffs' argument that the decision should be reversed because the trial court erroneously considered extrinsic evidence regarding the historical use of the gates. To begin, the Statement of Decision shows the trial court used the extrinsic evidence not to interpret the Easements, but to evaluate whether the gates unreasonably interfered with the Easements. In any event, plaintiffs have not shown that the court's consideration of such evidence was prejudicial, i.e., that it is reasonably probable a result more favorable to plaintiffs would have been reached if such evidence had not been considered. (*Red Mountain, LLC v. Fallbrook Public Utility Dist., supra*, 143 Cal.App.4th at p. 348.)

B.      *Surveillance of the Defendant*

Defendant claimed that plaintiffs' surveillance of her using automated security cameras and handheld devices was part of a campaign of harassment and an unreasonable interference with her Easement rights. Defendant sought declaratory relief that she has the right to use the Easements "free of harassment, oppression, intimidation, [and] surveillance" by plaintiffs. The trial court granted the relief in part, concluding that it is reasonable and permissible for plaintiffs to use the security cameras to monitor their property, but not reasonable for plaintiffs to retain images of defendant unless plaintiffs believe the images provide evidence of a violation of their property rights. Therefore, the court ruled that plaintiffs may continue to use security cameras, but plaintiffs must delete any images of defendant (or her tenant, family members, or known invitees) unless plaintiffs "believe, in good faith, that the images provide evidence of a trespass or other violation of their rights." The court also ruled that plaintiffs may not use cell phones, handheld cameras, or other handheld electronic devices to photograph defendant or her tenant, family members, or known invitees while they are lawfully using the Easements. The court noted defendant's belief that the use of the security cameras was part of a

38

campaign of harassment, and the court found "some reason to [conclude defendant's belief] is correct," but the court did not make any findings that plaintiffs were using the cameras to harass or intimidate defendant.

Plaintiffs contend that the trial erred in restricting their right to use handheld recording devices and in requiring them to delete security camera images of defendant (and her guests) unless they are believed to contain evidence of a violation. Plaintiffs argue that the retention of security camera images was not an issue raised at trial, and that there is no legal basis for prohibiting them from retaining images of defendant or from using handheld recording devices. Plaintiffs' argument has merit.

The issue before the trial court was whether the use of the surveillance cameras unreasonably interfered with defendant's use of the Easements. The court answered that question negatively, concluding it was reasonable for plaintiffs to use cameras to monitor their property, including the Easements, notwithstanding defendant's desire not to be photographed. In light of that ruling, we fail to see any legal basis for the court to prohibit handheld recording devices or to require plaintiffs to review and delete images of defendant. If it is reasonable for plaintiffs to photograph/record the Easements using the security cameras—and we agree that it is—then it is equally reasonable for plaintiffs to retain the images that are captured by those cameras. Likewise, if it is not unreasonable interference for plaintiffs to record defendant using stationary security cameras, we find it is not unreasonable interference for plaintiffs to record defendant using handheld cameras or cell phones. The trial court's ruling, while perhaps well-intended, is not supported by the evidence or legal authority. Defendant's remedy, if she feels she is being harassed, is to seek a civil restraining order. (Code Civ. Proc., § 527.6, subd. (b)(3); *Bookout v. Nielsen* (2007) 155 Cal.App.4th 1131, 1136, 1141.) We shall reverse the portions of the judgment requiring plaintiffs to delete security camera images and restricting plaintiffs' use of handheld recording devices.

39

C.    *No Trespassing Signs*

Defendant's cross-complaint sought a declaration that plaintiffs are prohibited from posting the "no trespassing" signs on their property in light of the provision in Exhibit F-1 to the Settlement, providing:  "It is understood and agreed that the only sign or signage at the entry to Parcel C-2 off of Highway 49 shall remain and be limited only to 'Garamendi-McSorley Ranch.' "  At trial, defendant further argued that because the "no trespassing" signs are misleading—suggesting that permission to pass must be obtained from plaintiffs—maintaining the signs unreasonably interfered with defendant's rights under the Easements.  The trial court ultimately concluded that posting the "no trespassing" signs on Parcel C-2 was not a violation of the Settlement.  However, the court held that the signs are misleading and posting the signs along the Easements was a potential deterrence to defendant's visitors and therefore an unreasonable interference with the Easements.  Accordingly, the court declared that plaintiffs may post the "no trespassing" signs "anywhere on [P]arcel C-2 *except* the [E]asements."

Plaintiffs contend that the prohibition on posting "no trespassing" signs on the Easement was an error and should be reversed because the signs are necessary to prevent trespass and prescriptive claims, and there is no evidence that the signs have caused any actual interference with the Easements.  We agree in part.

While we agree that plaintiffs have a right to post signs to prevent trespass and prescriptive claims (see Pen. Code, § 602; Civ. Code, § 1008), this does not give plaintiffs the right to post misleading signs that discourage visitors and thereby interfere with defendant's use of the Easements.  The "no trespassing" sign posted at the main entry was misleading because it was posted on the roadway that serves as the only means of access for four properties, with three different owners, but the sign only includes contact information for one owner (Garamendi McSorley Ranch, LLC).  The sign misleadingly suggests that the right to pass for each property is "by permission" and "subject to control of" Garamendi McSorley Ranch, LLC, and that "[v]iolators will be

40

[p]rosecuted" for trespass. In actuality, the holders of the Easements also may give permission to guests, contractors, and vendors, to use the roadway Easements to access their properties. Thus, there is substantial evidence to support the trial court's finding that posting the "no trespassing" sign on the roadway unreasonably interfered with defendant's use of the Easements. (See, e.g., *Norris v. State, supra*, 261 Cal.App.2d at pp. 44, 49; *Brearton v. Fina* (N.Y. Co. Ct. 1956) 3 Misc.2d 1, 10 [155 N.Y.S.2d 399, 408].)

Nonetheless, the judgment went too far in declaring that plaintiffs are prohibited from posting *any* "no trespassing" signs on the Easements. Plaintiffs may post "no trespassing" signs on the Easements provided the signs are not so misleading that they unreasonably interfere with the Easements. Thus, the portion of the judgment pertaining to the "no trespassing" signs shall be reversed and remanded for modifications consistent with this opinion.

V

*Costs And Attorney's Fees*

Plaintiffs argue that if we reverse the judgment in favor of defendant, the award of costs and attorney's fees to defendant as the prevailing party should also be reversed. Because we are partially reversing the trial court's judgment, we will remand for reconsideration of the prevailing party determination and award of fees and costs as appropriate.

## DISPOSITION

The portion of the trial court's judgment declaring that defendant has the right to use the Easements in tandem and that she is not required to traverse the entire length of an easement or to exit to Highway 49 when ingressing or egressing from a location is affirmed. The portion of the judgment declaring that defendant may travel along the easements "whatever distance is appropriate to her … purposes" is reversed and remanded for clarification consistent with this opinion.

The portions of the judgment pertaining to defendant's right to use the Easements for recreational activities, loitering/lingering, and parking are reversed, and the matter is remanded with directions to modify the judgment in a manner consistent with this opinion.

The portions of the judgment declaring that (1) plaintiffs must delete any images of defendant (or her tenant, family members, or known invitees) unless plaintiffs believe, in good faith, that the images provide evidence of a violation, and (2) that plaintiffs may not use cell phones, handheld cameras, or other handheld electronic devices to photograph/record defendant or her tenant, family members, or known invitees while they are lawfully using the Easements, are reversed with directions to enter a new judgment granting plaintiffs declaratory relief on this issue.

The portion of the judgment finding that the "no trespassing" signs posted by plaintiffs are misleading and unreasonably interfere with defendant's easement rights is affirmed, but the portion of the judgment suggesting that plaintiffs are prohibited from posting *any* "no trespassing" signs on the Easements is reversed with directions to modify the judgment in a manner consistent with this opinion.

The order awarding costs and attorney's fees is reversed and remanded for reconsideration of the prevailing party determination and award of fees and costs in light of this opinion.

In all other respects, the judgment is affirmed.  Each party shall bear its own costs on appeal.  (Cal. Rules of Court, rule 8.278(a)(3), (5).)

\s\
KRAUSE, J.

We concur:

\s\
EARL, P. J.

\s\
MAURO, J.